UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
MATTHEW GERMAIN,                                Civil Action No._____

    Plaintiff,

           v.

NIELSEN CO (US) LLC                             JURY TRIAL DEMANDED

    Defendant.
---------------------------------------------------------X

**COMPLAINT**

    Plaintiff Matthew Germain ("Plaintiff"), by and for his Complaint against Defendant Nielsen Co (US) LLC ("Defendant", "Nielsen" or "NielsenIQ"), hereby alleges as follows:

**I.      PRELIMINARY STATEMENT**

    Defendant has threatened to pursue a course of action designed to intimidate, frighten, and ultimately dissuade Plaintiff from moving forward with his legal claims against the Company. Plaintiff **never agreed** to be bound by any non-competition restrictions. Nonetheless, Defendant is attempting to use a basic agreement of confidentiality to prevent Plaintiff from ever working again in market research industry.

    Such interference by Nielsen is particularly damaging in the tight-knit and cohesive market research industry in which Plaintiff has built his career over the past 30 years. Nielsen's threatened actions of seeking out a prospective employer to "share" that Plaintiff is bound by post-termination obligations are likely to dissuade any prospective employer from

hiring Plaintiff, for fear of being placed in the middle of a conflict with another market research company.

Defendant's attempts to interfere with Plaintiff's career advancement and prospective employment relationships are clearly intended to intimidate and harass him into dropping his claims.  Such actions create a similarly chilling effect upon prospective employers, sending the message that Plaintiff's post-employment obligations to Nielsen restrict his ability to work for another market research company.

After having lured Plaintiff off a successful career trajectory with false promises, Defendant intends to continue jeopardizing his ability to earning a living in his profession. Defendant's chosen course of action shows a staggering lack of regard for Plaintiff's hard-earned career and livelihood.

## II.   PARTIES

1.   Plaintiff Matthew Germain is a resident of Danbury Connecticut.

2.   Defendant Nielsen Co (US) LLC is a Delaware limited liability company that provides a broad range of analytic and market data services.

## III.   JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

4.   Venue is proper in this District under 28 U.S.C. § 139l(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in New York.

## IV.   FACTUAL BACKGROUND

5. On or about July 21, 2021, Plaintiff received a LinkedIn message from Nielsen Talent Acquisition Manager Nick Lesser ("Lesser"), soliciting him for a role as Leader U.S. Commercial Partnerships.

6. Plaintiff had been working in the market research industry for over 30 years, including two periods of employment with Nielsen: as Director of Client Service from in or about October, 1993 to December, 1996; and as Director of Business Development from 2005 to 2006.

7. Currently, Plaintiff held the position of Senior Director of Partnerships at 1010Data.

8. Plaintiff told Lesser that he was willing to learn more about the opportunity with Nielsen.

9. During the many discussions that followed about the Leader U.S. Commercial Partnerships position, Plaintiff made it clear to Lesser that he was unable to travel during the pandemic due to several serious health conditions.

10. Lesser repeatedly assured Plaintiff, including a statement on July 26, 2021, that travel would not be necessary for the position.

11. In or about August 2021, Plaintiff was interviewed for the Leader U.S. Commercial Partnerships position by Nielsen SVP of Global Renewals Julian Baldwin, CRO Susan Dunn, and Managing Director North America Laura McCullough.

12. Plaintiff received an offer letter from Nielsen on September 1, 2021.

13. Later that week, Plaintiff accepted the position and provided his notice of resignation to 1010Data.

14. Plaintiff decided to accept the position with Nielsen because based on Lesser's assurances that he would not be required to travel.

15. At the time Plaintiff was hired, Nielsen was aware of his disabilities and the fact that he was unable to travel during the ongoing pandemic.

16. The Leader U.S. Commercial Partnerships job description did not include travel as a component of the role (Exhibit A).

17. Plaintiff's offer letter (Exhibit B) did not contain any reference to travel.

18. Critical to Plaintiff's decision to accept the position were Lesser's assurances that travelling was not a necessary element of the role and that Plaintiff would not be required to travel.

19. 1010Data tried to convince Plaintiff to remain with the company, but Plaintiff told them that he had already accepted the position with Nielsen.

20. Plaintiff indicated in Nielsen's onboarding and application documents that he suffered from a disability.

21. On September 21, 2021, Plaintiff signed a Confidentiality Agreement, preventing him from disclosing proprietary information belonging to Nielsen (Exhibit C).

22. On or about September 27, 2021, Plaintiff began working for Nielsen as Leader U.S. Commercial Partnerships, reporting to Julian Baldwin ("Baldwin") who was based in the UK.

23. Plaintiff's role was to manage Nielsen's approximately 32 active client renewals in the U.S.

24. In or about early October 2021, Baldwin asked Plaintiff to put together materials for a two-day meeting he intended to hold in Chicago to review the U.S. Team's direction for 2022.

25. Baldwin said that the first day of the meeting would be attended by Plaintiff's team alone, and on the second day, the team would present its 2022 direction and focus to the CRO.

26. Plaintiff immediately told Baldwin that he was not comfortable traveling due to his serious health conditions.

27. Baldwin then asked if Plaintiff would be more comfortable travelling to the New York office than the Chicago office, to which he responded that yes, the New York office would be better.

28. On or about December 7, 2021, Plaintiff's team met in the New York office and reviewed the planned presentation in detail.

29. Baldwin indicated that he was pleased with the information Plaintiff's team would be presenting to the CRO the following day.

30. On December 8, 2021, after the presentation to the CRO ended, Plaintiff met with Baldwin one-on-one and asked how he thought the presentation had gone.

31. To Plaintiff's surprise, Baldwin responded, "not well." Baldwin stated that he required Plaintiff to be, "open to travelling" for his role. He explained that when he had told the CRO, Susan Dunn, that Plaintiff had expressed concerns about travelling, she said that she didn't think Plaintiff was right for the job.

32. Plaintiff asked Baldwin if the CRO's opinion had anything to do with his medical conditions and his inability to travel, to which Baldwin responded, "travel is expected."

33. During this conversation, Baldwin did not cite any issues with Plaintiff's performance or failure to meet his objectives.

34. Before Plaintiff told Baldwin about his medical conditions and related travel limitations, Baldwin had given Plaintiff nothing but positive feedback about his job performance.

35. On or about December 10, 2021, Plaintiff visited his cardiologist, who reiterated his instruction that Plaintiff must avoid travel during the ongoing pandemic.

36. On or about December 13, 2021, Plaintiff informed Baldwin that his doctor had recommended he avoid travel.

37. Immediately after this conversation, Baldwin emailed Plaintiff stating that Plaintiff was, "*not currently meeting [Baldwin's] expectations for the role.*"

38. At this point, Plaintiff had been working in the job for only 43 days.

39. Nielsen typically conducts employee reviews on an annual basis. Expecting that all of Plaintiff's objectives could have been met within his first 43 days is extremely unrealistic.

40. Moreover, Plaintiff's three direct reports had each commented that they thought he was developing a great plan for 2022, and that he was an active manager, participating in all client meetings, presentations and proposal development.

41. Baldwin's email to Plaintiff further stated, "*I am concerned that 2022 and 2023 are only going to be more intense and faster paced and I am concerned at the pressure this is going to place on us both.*"

42. Plaintiff responded to Baldwin's email, rebutting the sudden and premature determination that Plaintiff was not meeting his goals by explaining in detail how he in fact had been making significant progress toward each of his goals.

43. Later that day, Plaintiff sent Human Resources Manager Patricia Whitmarsh ("Whitmarsh") a note from his cardiologist requesting a travel exemption accommodation.

44. Whitmarsh replied by telling Plaintiff that she would review his request with her manager. However, Plaintiff did not receive a response.

45. The following day, December 14, 2021, Baldwin sent Plaintiff an email refuting his rebuttal comments and asserting, "*none of my feedback on your performance has anything to do with your health issues (despite the fact that your inability to travel connected to these issues is new news to me).*"

46. Contrary to Baldwin's contention that he had just learned Plaintiff was unable to travel, Plaintiff had directly informed Baldwin of his medical disabilities and travel limitation in October, 2021.

47. On January 5, 2022, Plaintiff sent Baldwin a proposed team restructuring plan and suggested processes to shorten the response time for client contract renewals.

48. Plaintiff asked Baldwin to review the proposals prior to their scheduled phone call that Friday, but Baldwin never responded to his request.

49. During the phone call on Friday, January 7, 2022, Plaintiff reviewed his team restructuring plan and Baldwin indicated that he was pleased with Plaintiff's recommendations. Baldwin gave Plaintiff permission to review the plan with his team, which Plaintiff did the following week.

50. On January 13, 2022, Baldwin and Whitmarsh told Plaintiff that his employment was being terminated for "subpar" performance, based on feedback from CRO Susan Dunn and Managing Director North America Laura McCullough.

51. Plaintiff is not aware of any other instance, during his 30-year market research career, in which an employee was terminated for failure to meet goals after a period of only three months.

52. During his termination meeting, Plaintiff expressed that he was unwilling to sign any separation document that would prevent him from working from a competitor.

53. On January 20, 2022, Plaintiff, through his counsel, sent Nielsen a Notice of Claims and Demand for Settlement, asserting claims for disability discrimination and retaliation, fraudulent misrepresentation/inducement, and breach of the implied covenant of good faith and fair dealing.

54. Later that day, Nielsen, through counsel, sent Plaintiff a copy of the Confidentiality Agreement he had signed when he was hired and a letter to "*remind [him] of [his] post-employment obligations.*" (Exhibit D).

55. Nielsen's letter demanded that Plaintiff submit a written acknowledgement to "*confirm he understands his post-employment confidentiality obligations*", "*[i]n order to avoid further steps by NielsenIQ to enforce*" such obligations (Exhibit D).

56. On January 21, 2022, Plaintiff, through counsel, submitted written confirmation that he understands and intends to abide by his post-employment confidentiality obligations (Exhibit E).

57. Later that day, Nielsen, through counsel, sent an email acknowledging that Plaintiff, "*doesn't have a non-compete in place*", but nonetheless cautioning him against seeking future employment in the market research industry (Exhibit F).

58. Plaintiff, through counsel, responded by stating his position that, "*the confidentiality agreement does not implicate any non-competition obligations on [Plaintiff]'s*

*part with respect to future employment in the industry."* (Exhibit G).

59. Nielsen, through counsel, then threatened, *"NielsenIQ will certainly share the confidentiality agreement with a new employer if we learn that [Plaintiff] is in a similar role."* (Exhibit H).

60. Plaintiff had been bound by similar confidentiality agreements after he had resigned from his previous positions with Nielsen. However, even though Plaintiff had held each of these positions significantly longer than his three months as Leader U.S. Commercial Partnerships, Nielsen had never threatened to contact a new employer to share his confidentiality agreements.

61. Attempting to resolve the matter without the need for judicial involvement, Plaintiff's counsel again reaffirmed Plaintiff's intention to abide by his post-employment confidentiality obligations, and cautioned Nielsen against interfering with Plaintiff's prospective employment relationships. Plaintiff's counsel asked Nielsen to clarify its intentions with regard to Plaintiff's prospective employment relationships, but did not receive a response (Exhibit I).

62. On February 4, 2022, Plaintiff filed an EEOC Charge alleging discrimination and retaliation based on disability (pending EEOC Charge No. 520-2022-03461).

63. Since Plaintiff's termination, he has found that despite his years of hard work and excellent performance, invariably, industry hiring professionals are unwilling to overlook the brevity of his employment as Leader U.S. Commercial Partnerships at Nielsen. Plaintiff's less than four-month employment period at Nielsen had damaged his career prospects immeasurably.

64. Nielsen induced Plaintiff to leave his secure long-term employment by fraudulently misrepresenting the expectations of the position.

65. Defendant now threatens to further harm Plaintiff's ability to earn a living in his profession by imposing fabricated non-compete obligations upon him.

V.     **COUNT ONE: FRAUDULENT MISREPRESENTATION/ INDUCEMENT**

66. Paragraphs 1-65 are incorporated by reference herein.

67. Defendant fraudulently misrepresented the terms and conditions associated with the Leader U.S. Commercial Partnerships position for the purpose of inducing Plaintiff into accepting employment.

68. Knowing that Plaintiff was unable to travel during the pandemic due to his disabilities, Nielsen, through Talent Acquisition Manager Nick Lesser, told Plaintiff on multiple occasions, including on July 26, 2021, that travel was not a requirement of the position.

69. Both the job description and offer letter that followed confirmed that Plaintiff would not be expected to travel as Leader U.S. Commercial Partnerships.

70. Defendant knew at the time such representation was made that in fact, Plaintiff would be required to travel as Leader U.S. Commercial Partnerships.

71. Defendant knew that Plaintiff would not leave the security of his employment for a position in which he would be required to risk his health by travelling.

72. Relying on Defendant's intentional misrepresentations, Plaintiff left his former employment to accept the position as Leader U.S. Commercial Partnerships.

73. As a result of Defendant's deliberate misrepresentations, Plaintiff has sustained economic damages due to the loss of his previous employment and inability to find new employment following his termination.

74. Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

VI.       **COUNT TWO: NEGLIGENT MISREPRESENTATION/ INDUCEMENT**

75. Paragraphs 1-74 are incorporated by reference herein.

76. Defendant had a duty, as a result of the prospective employment relationship, to provide Plaintiff with accurate information about the expectations and requirements of the Leader U.S. Commercial Partnerships position.

77. As Defendant's Talent Acquisition Manager, Nick Lesser should have known that the individual hired for the Leader U.S. Commercial Partnerships position would be required to travel.

78. Defendant knew that because of Plaintiff's disabilities, being able to refrain from travelling during the pandemic was a critical component to Plaintiff's decision to accept the Leader U.S. Commercial Partnerships position.

79. Plaintiff reasonably relied on Defendant's misrepresentations to his detriment.

80. As a result of Defendant's misrepresentations, Plaintiff has sustained economic damages due to the loss of his previous employment and inability to find new employment following his termination.

81. Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

## VII.     COUNT THREE:   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

82. Paragraphs 1-81 are incorporated by reference herein.

83. Every contract in the State of New York includes an implied covenant of good faith and fair dealing.

84. A contract was formed when Plaintiff signed and returned Defendant's September 1, 2021 offer letter.

85. Defendant breached the implied covenant of good faith and fair dealing in terminating Plaintiff's employment because he was unable to travel, contrary to the terms of the contract.

86. As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered damages, including economic losses, extreme indignities and humiliation, severe emotional distress, mental anguish, loss of enjoyment of life, loss of standing in the community, and destruction of his personal and professional reputation.

87. Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

**WHEREFORE**, Plaintiff prays that the Court grant the following relief:

(1) A preliminary injunction preventing Defendant from contacting Plaintiff's prospective employers, or communicating any information to a third party other than Plaintiff's position and dates of employment;

(2) An injunction permanently barring Defendant from contacting Plaintiff's prospective employers;

(3) An injunction permanently barring Defendant from communicating any information to a third party other than Plaintiff's position and dates of employment;

(4) Damages in an amount to be determined at trial;

(5) All expenses incurred by Plaintiff in connection with this action, including costs and attorneys' fees; and

(6) Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

Respectfully submitted,

PLAINTIFF
MATTHEW GERMAIN

/s/ *Jill Saluck*

Jill Saluck (NY2848786)
Saluck, Halper & Lehrman PLLC
75 S. Broadway, Suite 400
White Plains, NY 10601
tel. (914)246-2686
jsaluck@employ-law.com