UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/8/2023

---------------------------------------------------------------X
                                                               :
  MATTHEW GERMAIN,                                             :
                                                               :
                                          Plaintiff,           :          1:22-cv-1314-GHW
                     -against-                                 :
                                                               :          MEMORANDUM OPINION &
  NIELSEN CONSUMER LLC d/b/a                                   :                  ORDER
  NIELSENIQ,                                                   :
                                          Defendant.           :
---------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

In July 2021—in the midst of the global COVID-19 pandemic—Matthew Germain was working in a secure job that allowed him to work from home. He needed to do so because he suffered from a variety of ailments that made travel to, and for, work particularly dangerous for him. Nielsen Consumer LLC lured him to take a new position with the company, promising that he would not be required to travel in the new job. But shortly after he joined Nielsen, Mr. Germain was told that his job required that he travel—health conditions and Nielsen's prior commitments notwithstanding. Because Mr. Germain was induced to leave his prior position by Defendant's false commitment that the job would not require travel, Defendants' motion to dismiss Plaintiff's claim for fraudulent misrepresentation is denied. And because Mr. Germain's health conditions prevented him from safely travelling from his home for work, he has adequately pleaded that he was disabled. Therefore, Defendant's motion to dismiss is DENIED IN PART and GRANTED IN PART.

# I.  BACKGROUND

## a.  Facts[1]

Mr. Germain has worked in market research for over 30 years.  Third Amended Complaint ("Am. Compl."), Dkt. No. 42, ¶ 10.  His work included two stints at Nielsen Consumer LLC d/b/a NielsenIQ ("Nielsen").  Between 1993 and 1996, Mr. Germain worked as Nielsen's Director of Client Service.  *Id.*  He returned to work at Nielsen from 2005 through 2006 as its Director of Business Development.  *Id.*  This case concerns Mr. Germain's short-lived, and ill-fated third job at the company.

The opportunity for Mr. Germain to rejoin Nielsen arrived out of the blue.  In July of 2021, just over a year into the global COVID-19 pandemic, Mr. Germain was working for a company named 1010Data in a senior role—as its Senior Director of Partnerships.  On July 21, 2021, Mr. Germain received a LinkedIn message from Nick Lesser.  *Id.* ¶ 9.  Mr. Lesser was Nielsen's "Talent Acquisition Manager."  *Id.*  In his message, Mr. Lesser asked Mr. Germain if he would be interested in taking on a new position at Nielsen as the company's Leader of U.S. Commercial Partnerships.  *Id.*  Mr. Germain was interested:  he told Mr. Lesser that "he was willing to learn more about the opportunity with Nielsen."  *Id.* ¶ 12.  Many discussions followed.

During those discussions, Mr. Germain "made it clear to Lesser that he was unable to travel during the pandemic due to several serious health conditions."  *Id.* ¶ 13.  Mr. Germain "suffers from numerous disabilities[,] including [chronic obstructive pulmonary disease ('COPB')], heart disease, cardiomyopathy, diabetes, and asthma, which make him particularly vulnerable to the Covid-19

---

[1] These facts are drawn from Plaintiff's Amended Complaint and are accepted as true for the purposes of this motion to dismiss.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In his opposition, Mr. Germain tried to add more allegations.  But the Court can only consider the allegations in the complaint and documents that are integral to the complaint.  *See, e.g.*, *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.")

virus." *Id.* ¶ 14.  Mr. Lesser repeatedly reassured Mr. Germain that "travel would not be necessary for the position." *Id.* ¶ 15.

So Mr. Germain accepted an interview for the position.  In August 2021, Mr. Germain was interviewed for the job by several senior staff members at Nielsen, including CRO Susan Dunn.  *Id.* ¶ 16.[2]  On September 1, Mr. Germain received an offer letter from Nielsen.  *Id.* ¶ 17.  The offer letter made clear that Mr. Germain's employment with Nielsen was "at-will."  Am. Compl. Ex. 3 at 2.  As the letter described, the fact that he was an at-will employee "means either you or the company may voluntarily terminate your employment at any time."  *Id.*

Mr. Germain accepted the offer the week that he received it.  *Id.*  He also submitted his resignation letter to 1010Data.  *Id.*  1010Data tried to persuade Mr. Germain to stay.  *Id.* ¶ 24.  But Plaintiff declined, telling them that he had already accepted the new position at Nielsen.

Mr. Germain alleges that he accepted the job with Nielsen "based on Lesser's assurances that he would not be required to travel." *Id.* ¶ 19.  And he details the fact that Nielsen was fully aware of his disabilities and that he was unable to the travel during the pandemic.  *Id.* ¶ 20.  Not only had he described his limitations to Mr. Lesser, as outlined above, but Mr. Germain also made a note of his health conditions on his application, and later, in his onboarding materials.  *Id.* ¶ 25.  The job description for his position did not include any reference to travel as a component of the position.  *Id.* ¶ 21.  Nor did his offer letter refer to a need to travel for the position.  *Id.* ¶ 22.  "Critical to Plaintiff's decision to accept the position were Lesser's assurances that travelling was not a necessary element of the role and that Plaintiff would not be required to travel."  *Id.* ¶ 23.  According to the complaint, Mr. Germain's expectations that he would not need to travel to perform his job were dashed shortly after he began work.

---

[2] The Court assumes that "CRO" is the acronym for Chief Revenue Officer.

Mr. Germain began working in his new job on September 29, 2021. *Id.* ¶ 27. Shortly thereafter, Julian Baldwin, Mr. Germain's supervisor, asked Mr. Germain to put together some materials for a two-day meeting in Chicago. *Id.* ¶ 29. Mr. Germain immediately told Mr. Baldwin that he was uncomfortable traveling due to his severe health conditions. *Id.* ¶ 31. Mr. Baldwin then asked if Mr. Germain would "be more comfortable travelling to the New York office than the Chicago office . . . ." *Id.* ¶ 32. Mr. Germain—who resided in Danbury, Connecticut—responded that "yes, the New York office would be better." *Id.* ¶¶ 1, 32.

Mr. Germain and his team met in Nielsen's New York office on December 7, 2021 to prepare for a presentation to the CRO the next day. *Id.* ¶ 33. Mr. Baldwin was pleased. But after the presentation to the CRO in the New York office the following day, Mr. Baldwin told Mr. Germain that the presentation had not gone well. *Id.* ¶¶ 35-36. The issue, Mr. Germain alleges, was not the substance of the presentation, but Nielsen's unhappiness with his inability to travel. *Id.* ¶ 40.

Mr. Baldwin told Mr. Germain that he required him to be "open to traveling." *Id.* ¶ 36. "He explained that when he had told the CRO, Susan Dunn, that Plaintiff expressed concerns about travelling, she said that she didn't think Plaintiff was right for the job." *Id.* Mr. Baldwin baldly told Mr. Germain that for his work "travel is expected." *Id.* ¶ 37.

On December 10, 2021, after his conversation with Mr. Baldwin, Mr. Germain visited his cardiologist. *Id.* ¶ 42. The cardiologist reiterated his instruction that Mr. Germain "must avoid travel during the ongoing pandemic." *Id.* Three days later, on December 13, 2021, Mr. Germain told Mr. Baldwin that his doctor had recommended that he avoid travel. *Id.* ¶ 43.

Before Mr. Germain told Mr. Baldwin about his medical conditions and related travel limitations, Mr. Baldwin had given Plaintiff nothing but positive feedback about his job performance. *Id.* ¶ 41. After his December 13 conversation with Mr. Baldwin, however, "Plaintiff suddenly began to receive negative feedback about his performance." *Id.* ¶ 44. Mr. Germain asserts

that he requested an accommodation for his disability, and that, immediately afterward, Mr. Baldwin

wrote Mr. Germain that he was "not currently meeting [Baldwin's] expectations for the role." *Id.*

¶ 45 (emphasis omitted).  Mr. Baldwin's email went on:  "I am concerned that 2022 and 2023 are

only going to be more intense and faster paced and I am concerned at the pressure this is going to

place on us both." *Id.* ¶ 49 (emphasis omitted).

Mr. Germain responded to Mr. Baldwin's email.  He rebutted "the sudden and premature

determination that Plaintiff was not meeting his goals by explaining in detail how in in fact had been

making significant progress toward each of his goals." *Id.* ¶ 50.  Mr. Germain also submitted a

request to Nielsen's human resources manager for an accommodation that would exempt him from

the need to travel from his home for work. *Id.* ¶ 51.  He attached a note from his cardiologist to the

note. *Id.*  Nielsen's human resources officer stated that she would review the request, but never

responded to the application for an accommodation. *Id.* ¶ 52.

Instead, the next thing that Mr. Germain saw on this topic was an email from Mr. Baldwin,

asserting that "none of my feedback on your performance has anything to do with your health issues

(*despite the fact that your inability to travel connected to these issues is new news to me.*)" *Id.* ¶ 53 (emphasis

added).  Mr. Germain believed that the emphasized comment was false:  after all, "Plaintiff had

directly informed Baldwin of his medical disabilities and travel limitation in October, 2021." *Id.*

¶ 54.  And, of course, Mr. Germain had informed Mr. Lesser of his constraints during the

recruitment and onboarding process.

On January 23, 2022, Mr. Germain's was terminated as a result of his allegedly "subpar"

performance. *Id.* ¶ 58.  He had been on the job for less than four months.  After he was fired, Mr.

Germain tried to find another job. *Id.* ¶ 60.  But he has since found that hiring professionals are

"unwilling to overlook the brevity of his employment . . .  at Nielsen." *Id.*  "Plaintiff's less than

four-month employment period at Nielsen had damaged his career prospects immeasurably." *Id.*

**b. Procedural History**

Mr. Germain filed a charge with the Equal Employment Opportunity Commission (the

"EEOC") on February 4, 2022.  Dkt. No. 55, Ex. 1.  On April 22, 2022, the EEOC wrote counsel

for Mr. Germain regarding the charge.  In its letter, the EEOC wrote the following:

> The Commission has reviewed all the circumstances of this case to ascertain whether
> we will be able to complete our administrative process within 180 days.  We have
> concluded that we will not be able to complete our administrative process within the
> allotted 180 days since your client's charge was filed, and we are issuing the requested
> *Notice of Right to Sue.*

Dkt. No. 58, Ex. 3.  The EEOC issued a right-to-sue letter the same day.  Dkt. No. 58, Ex. 2.

Mr. Germain filed his original complaint in this action on February 16, 2022.  Dkt. No. 1.

Mr. Germain filed a First Amended Complaint on February 17, 2022.  Dkt. No. 10.  Mr. Germain

filed a second amended complaint on May 18, 2022.  Dkt. No. 47.

Defendant filed the motion to dismiss that is the subject of this opinion on July 5, 2022.

Dkt. No. 54 (notice of motion); Dkt. No. 56 (memorandum of law) ("D. Mem.").  In its motion,

Defendant presents a number of arguments.  Among them are five principal arguments.  First,

Defendant argues that because Mr. Germain was an at-will employee, he cannot bring a claim for

fraudulent misrepresentation as a result of his termination.  This argument is premised on the

conceit that Plaintiff's claims are based on allegedly false "representations of future intentions, such

as job security."  D. Mem. at 8.  Second, Defendant argues that Mr. Germain has not adequately

pleaded his claim for fraudulent misrepresentation.  Third, Defendant contends that Mr. Germain

failed to exhaust his administrative remedies properly because the EEOC issued its right-to-sue

letter less than 180 days after the date on which he filed his charge with the agency.  Fourth,

Defendant argues that Mr. Germain was not entitled to the protections of the Americans with

Disabilities Act (the "ADA"), largely because Nielsen believes that he has not adequately alleged that

his serious medical conditions rendered him disabled.  And finally, Defendant argues that Mr.

Germain, a Connecticut resident who only worked for two days in New York, may not sue under the New York State Human Rights Law (the "NYSHRL") or the New York City Human Right Law (the "NYCHRL"). The Court addresses each of these arguments in turn below.

## II.        LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545. And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679 (citation omitted).

When reviewing a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference."

*Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other

citations omitted)).  A court may also consider a document "solely relie[d]" on by the plaintiff if it

"is integral to the complaint."  *Id.* (quotation and brackets omitted).  A document is "integral to the

complaint" if the complaint "relies heavily" on the document's "terms and effect."  *Nicosia v.

Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 305

n.3 (2d Cir. 2015) (holding that a court may "consider the plaintiff's relevant filings with the EEOC"

on a motion to dismiss if the filings "are integral to and solely relied upon by the complaint"

(quotation and brackets omitted)).  A plaintiff must "*rely* on the terms and effect of the document in

drafting the complaint; mere notice or possession is not enough."  *Nicosia*, 834 F.3d at 231

(emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir.

2006).

Mr. Germain's fraudulent misrepresentation claim must also satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b).  Under Rule 9(b), claims alleging fraud "must

state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This "ordinarily

requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent.'"  *United States ex rel. Chorches v. Am. Med. Response, Inc.*,

865 F.3d 71, 81 (2d Cir. 2017) (quoting *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d

Cir. 2016)).  "Rule 9(b) is "designed to provide a defendant with fair notice of a plaintiff's claim, to

safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a

defendant against the institution of a strike suit."  *Id.* at 86 (quoting *Ladas*, 824 F.3d at 25).

III.      DISCUSSION

   A.  Fraudulent Misrepresentation Claim

          i.  Plaintiff's Fraudulent Misrepresentation Claim is Adequately Pleaded

Mr. Germain has adequately pleaded a claim for fraudulent misrepresentation because Nielsen induced him to depart his prior job on the basis of false representations.  "The familiar elements of a fraudulent misrepresentation claim are that:  (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance."  *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940 (2d Cir. 1998). The complaint easily meets each of these requirements, even when viewed under the exacting standard required by Rule 9(b).

The complaint identifies with particularity the false representations made by Nielsen:  Mr. Lesser repeatedly reassured Mr. Germain that the new position would not require travel.  Those statements, Mr. Germain pleads, were false, and knowingly so.  Shortly after he joined Nielsen, Mr. Germain's supervisor, Mr. Baldwin, told Mr. Germain that "travel is expected" for Mr. Germain's position.  Am. Compl. ¶ 36.  Mr. Germain plausibly alleges that Mr. Lesser, Nielsen's "Talent Acquisition Manager," "should have known that the individual hired for the Leader [of] U.S. Partnerships position would be required to travel."  *Id.* ¶ 75.

The complaint also adequately pleads that Mr. Lesser's fraudulent statements about the job's requirements were made to induce Mr. Germain to leave his secure position at 1010Data.  Mr. Germain had "made it clear to Lesser that he was unable to travel during the pandemic due to several serious health conditions."  *Id.* ¶ 13.  Defendant "knew that Plaintiff would not leave the security of his employment for a position in which he would be required to risk his health by traveling."  *Id.* ¶ 69.  As a result, the complaint plausibly pleads, Mr. Lesser lied to Mr. Germain to

cause him—a professional with expertise valued by Nielsen and 1010Data—to leave his secure job and join Nielsen.  Mr. Germain reasonably relied on the representation.

Finally, Mr. Germain has adequately pleaded causation.  "To satisfy that element, a plaintiff must allege both that the 'defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation).'"  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) (*quoting Laub v. Faessel*, 297 A.D.2d 28, 745 N.Y.S.2d 534, 536 (1st Dep't 2002)).  The complaint is replete with allegations that Plaintiff would not have taken the job but for Mr. Lesser's misstatements.  Mr. Germain summarizes those allegations as follows: "Critical to Plaintiff's decision to accept the position were Lesser's assurances that traveling was not a necessary element of the role and that Plaintiff would not be required to travel."  Am. Compl. ¶ 23.

Mr. Germain has also pleaded loss causation.  "Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Fin. Guar. Ins. Co.*, 783 F.3d at 402 (internal quotations and citations omitted).  Here, there is a manifest link between the alleged misconduct and the harm that Mr. Germain allegedly suffered as a result of his departure to leave a secure job for a short stint at Nielsen.  "Relying on Defendant's intentional misrepresentations, Plaintiff left his former employment to accept the position of Leader U.S. Commercial Partnerships.  As a result of Defendant's deliberate misrepresentations, Plaintiff has sustained economic damages due to the loss of his previous employment and inability to find new employment following his termination."  Am. Compl. ¶¶ 70-71.

The extent of Plaintiff's ultimate damages will, of course, be limited by the "out-of-pocket" rule.  *Hyman v. Int'l Bus. Machines Corp.,* No. 98 CIV.1371(JSM), 2000 WL 1538161, at *2 (S.D.N.Y. Oct. 17, 2000) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 668 N.E.2d 1370, 1373,

646 N.Y.S.2d 76 (N.Y. 1996)).  But Defendant's argument that the rule bars recovery here, such that

Plaintiff cannot adequately plead loss causation, is misplaced.  "As courts have held, loss of

professional opportunity and reputation, and loss of benefits flowing from one's previous

employment all are cognizable losses in employment-related fraudulent inducement cases."  *Kwon v.*

*Yun,* 606 F. Supp. 2d 344, 360–61 (S.D.N.Y. 2009).

### ii.   The At-Will Employment Doctrine Does Not Bar Claim

The at-will employment doctrine does not bar Mr. Germain's fraudulent misrepresentation

claim.  "Under New York law, at-will employees cannot recover for wrongful termination, nor can

they evade this bar by suing in tort."  *Hyman*, 2000 WL 1538161, at *2.  Defendant invokes this

doctrine at length in its memorandum of law in support of its motion to dismiss.  The false premise

of Defendant's argument is that Mr. Germain is suing to recover damages for his termination.  *See,*

*e.g.,* D. Mem. at 12 ("Plaintiff does not allege a separate and distinct injury from the termination of

his at-will employment.").  This argument misconstrues the gravamen of Plaintiff's claim, which as

clearly stated in the complaint, is based on Defendant's fraudulent inducement of him to leave his

prior job, not a promise of indefinite employment at his new job.

For more than three decades, it has been clear in this circuit that the at-will employment

doctrine does not bar claims for fraudulent inducement where the claim involves false promises to

cause an employee to leave a prior position.  In *Stewart v. Jackson & Nash*, 976 F.2d 86 (2d Cir. 1992),

the Second Circuit sustained a claim brought by a lawyer who was fraudulently induced to leave one

firm and join another.  The court of appeals reasoned that the plaintiff's "injuries . . . commenced

well before her termination and were, in several important respects, unrelated to it."  *Id.* at 88.

"Courts since *Stewart* have allowed claims for fraudulent inducement where the injury alleged stems

from leaving a former place of employment or agreeing to remain in a compromised position at a

current place of employment, rather than from the termination or failure to perform terms of the

employment agreement." *Hyman*, 2000 WL 1538161, at *3. Defendant offers nothing more than sophistry to explain why this long-standing principle should not be applied in this case. Plaintiff's fraudulent claim is based on his decision to leave his prior firm, and therefore is not barred by the at-will employment doctrine.

## B. Claims Under the Americans with Disabilities Act

### a. Plaintiff Properly Exhausted His Administrative Remedies

Mr. Germain has properly exhausted his administrative remedies because the right-to-sue letter issued by the EEOC was valid, notwithstanding the fact that it was issued less than 180 days after Mr. Germain filed his charge. As a predicate to filing suit under the ADA, a private plaintiff must first file a timely charge with the EEOC. *See* 42 U.S.C. § 12117. "Exhaustion of administrative remedies through the EEOC is 'an essential element' of the . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam) (quoting *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)) (regarding same requirements in the context of a claim under Title VII). "The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998)). That purpose "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *Miller v. Int'l Tel. & Tel. Corp.,* 755 F.2d 20, 26 (2d Cir. 1985). "The right to sue letter is a necessary prerequisite to filing suit." *Newsome v. Berman*, 24 F. App'x 33, 34 (2d Cir. 2001) (citing 42 U.S.C. § 2000e–5(f)(3)) (summary order) (regarding same requirements in the context of a claim under Title VII).

The statute outlines the process that the EEOC must follow after it receives a charge. "Whenever a charge is filed by . . . a person claiming to be aggrieved . . . the Commission . . . shall

serve a notice of the charge . . . , and *shall make an investigation thereof*." 42 U.S.C. § 2000e-

5(b)(emphasis added). Section 2000e-5(f)(1) of the statute describes the process for the issuance of

a right-to-sue letter by the EEOC, which is the predicate for a private action under the ADA. It

provides, in relevant part, the following:

> If a charge filed with the Commission pursuant to subsection (b) is dismissed by the
> Commission, or if within one hundred and eighty days from the filing of such charge
> . . . the Commission has not filed a civil action . . . or the Commission has not
> entered into a conciliation agreement to which the person aggrieved is a party, the
> Commission . . . shall so notify the person aggrieved and within ninety days after the
> giving of such notice a civil action may be brought against the respondent named in
> the charge . . . .

42 U.S.C. § 2000e-5(f)(1). The "notice" described in this section of the statute is what is commonly

referred to as a right-to-sue letter.

The EEOC has promulgated a regulation that permits the agency to issue "early" right-to-

sue letters. ("Early," that is, because they are issued before 180 days have elapsed after the filing of

the charge.) The regulation permits such "early" right-to-sue letters if a designated official from the

EEOC "has determined that it is probable that the Commission will be unable to complete its

administrative processing of the charge within 180 days from the filing of the charge and has

attached a written certificate to that effect." 29 C.F.R. § 1601.28(a)(2).

Defendant's argument that 42 U.S.C. § 42 U.S.C. § 2000e-5(f)(1) unambiguously bars the

issuance of a right-to-sue letter before 180 days have elapsed after a charge is not sound. While

many courts have written about this provision of the statute, Chief Judge Mukasey ably captured its

import: "[i]n simple terms, § 2000e-5(f)(1) states that if X occurs, or if Y occurs, then the

Commission shall issue a notice of right to sue. However, the word 'if together with 'shall' does not

bar the conclusion that even when neither of the two conditions occurs, the Commission still may

issue a notice of right to sue." *Figueira v. Black Ent. Television*, Inc., 944 F. Supp. 299, 305 (S.D.N.Y.

1996). Every court of appeals that has considered Section 2000e-5(f)(1) has agreed that it does *not*

bar the issuance of right-to-sue letters before the expiration of the 180-day period following the filing of a charge. *See, e.g., Walker v. United Parcel Serv., Inc.,* 240 F.3d 1268 (10th Cir. 2001); *Sims v. Trus Joist MacMillan,* 22 F.3d 1059, 1061-63 (11th Cir. 1994); *Saulsbury v. Wismer & Becker, Inc.,* 644 F.2d 1251 (9th Cir. 1980); *Martini v. Fed. Nat'l Mortg. Ass'n,* 178 F.3d 1336 (D.C. Cir. 1999). Significantly, even the D.C. Circuit Court of Appeals, which has held that the EEOC's regulation permitting "early" right-to-sue letters is invalid, agrees that Section 2000e-5(f)(1) does not unambiguously bar them. The *Martini* court wrote that "[n]othing in section 2000e–5(f)(1)'s language forecloses Martini's view that the 180–day provision is simply a maximum, not minimum, waiting period for complainants seeking access to federal court." *Martini,* 178 F.3d at 1344.

Thus, Defendant's argument that the EEOC's regulation permitting the issuance of a right-to-sue letter prior to the expiration of 180 days following the charge "is contravened by the plain and unambiguous language of Section 2000e-5(f)(1)" rests on shaky ground. D. Mem. at 17. Defendant's argument relies solely on the district court's decision in *Gibb v. Tapestry, Inc.,* No. 18-CV-6888 (LAP), 2018 WL 6329403, at *4 (S.D.N.Y. Dec. 3, 2018). That case concluded that Section 20003-5(f)(1) on its own "plainly provides that, after a charge has been filed, the EEOC has 180 days to dismiss the charge or file a civil action." That view has not been shared by any of the courts of appeals, and this Court believes that it misconstrues the text of the statute, as aptly summarized by Chief Judge Mukasey.

There is a circuit split on the validity of "early" right-to-sue letters. *Compare Walker,* 240 F.3d at 1275 (upholding the EEOC's regulation); *Sims,* 22 F.3d at 1061-63 (same); *Saulsbury,* 644 F.2d at 1257 (same) with *Martini v. Fed. Nat'l Mortg. Ass'n,* 178 F.3d at 1347 (invalidating EEOC regulation); *Moteles v. Univ. of Pa.,* 730 F.2d 913, 917 (3d Cir. 1984) (noting, in dicta, that "premature resort to the district court [for Title VII claims] should be discouraged as contrary to congressional intent"). But, as described above, the D.C. Circuit Court of Appeals did not rest its decision to invalidate the

issuance of "early" right-to-sue letters on the text of Section 2000e-5(f)(1) alone, as Defendant argues here. Instead, the D.C. Circuit concluded that a separate section of the statute, Section 2000e-5(b), makes the EEOC's duty to investigate "both mandatory and unqualified." *Martini*, 178 F.3d at 1346. The D.C. Circuit could not "square" the regulation permitting the issuance of "early" right-to-sue letters with "section 2000e–5(b)'s express direction to the Commission that it investigate all charges." *Id.* The court concluded that "that the EEOC's power to authorize private suits within 180 days undermines its express statutory duty to investigate every charge filed, as well as Congress's unambiguous policy of encouraging informal resolution of charges up to the 180th day. We thus hold that Title VII complainants must wait 180 days after filing charges with the EEOC before they may sue in federal court." *Id.* Defendant's argument that Section 2000e-5(f)(1) alone requires the invalidation of the EEOC's regulation does not find support in the D.C. Circuit's decision in *Martini*.

The fact that the argument presented by Defendant is unsound does not end the Court's analysis. Lacking guidance from the Second Circuit,[3] the Court must evaluate whether the Commission's regulation is sound. The Court joins the many district courts in this district that have decided that it is. *See, e.g.*, *Mwangi v. Passbase, Inc.*, No. 21 CIV. 6728 (ER), 2022 WL 2133734, at *4 (S.D.N.Y. June 14, 2022); *Hernandez v. Premium Merch. Funding One, LLC*, No. 19CV1727, 2020 WL 3962108, at *6 (S.D.N.Y. July 13, 2020); *Palumbo v. Lufthansa German Airlines*, No. 98 Civ. 5005, 1999 WL 540446, at *2 (S.D.N.Y. July 26, 1999); *Figueira*, 944 F. Supp. at 303-08.

When tasked with reviewing an agency's interpretation of a statute that the agency is charged with administering, courts apply the two-step framework set forth in *Chevron U.S.A. Inc. v. Natural*

---

[3] The Second Circuit has not addressed this question. *See Hankins v. Lyght*, 441 F.3d 96, 101 (2d Cir. 2006) ("We have not decided whether the regulation allowing early issuance of right-to-sue notices, 29 C.F.R. § 1601.28(a)(2), is a permissible construction of Section 2000e-5. We express no opinion on the issue here, although we note that two circuits and several district courts within this circuit have disagreed with [courts invalidating the regulation]."); *Arroyo v. WestLB Admin., Inc.*, 213 F.3d 625, 2000 WL 562425, at *1 (2d Cir. 2000) (summary order) (concluding that panel "need not, and do not, reach this complicated question"). Because the court of appeals has declined to decide this complicated issue, each of the district courts in the circuit, and the litigants in it, are required to grapple with this issue on their own.

*Resources Defense Council, Inc.,* 467 U.S. 837 (1984).  "First, always, is the question whether Congress

has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end

of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

intent of Congress."  *Chevron*, 467 U.S. at 842-43.  If, however, "the statute is silent or ambiguous

with respect to the specific issue," the court cannot "simply impose its own construction on the

statute."  *Id.* at 843.  Rather, the court must defer to the agency interpretation so long as the agency

interpretation is "a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  "To

determine whether a statute is ambiguous, we employ 'traditional tools of statutory construction' to

ascertain if 'Congress had an intention on the precise question at issue' that 'must be given effect.'"

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envt'l. Prot. Agency*, 846 F.3d 492, 508 (2d Cir. 2017)

(quoting *Chevron*, 467 U.S. at 843 n.9).

     As described above, Section 2000e-5(f)(1) does not prohibit the issuance of right to sue

letters before the expiration of the 180-day period following the filing of the charge.  If anything, the

use of the word "within" in that provision of the statute suggests that "early" right-to-sue letters are

appropriate.  The statute states that the right-to-sue letter may be issued "if *within* one hundred and

eighty days from the filing of such charge . . . the Commission has not filed a civil action."  42

U.S.C. § 2000e-5(f)(1) (emphasis added).  "*Within* a particular length of time means before that

length of time has passed."  Collins English Dictionary

(https://www.collinsdictionary.com/us/dictionary/english/within).  The use of the word "within"

suggests that Congress anticipated that the decision by the Commission could happen in less than

180 days.  Congress might have established a clear end date by writing the statute as follows:  "if one

hundred and eighty days from the filing of such charge . . . ."  It did not.  Instead, the statute

anticipates the issuance of the notice if the Commission has not acted "within" 180 days, which

anticipates the issuance of a letter before the expiration of the 180-day period.  The language of this

section of the statute does not support the conclusion that the Commission must wait for 180 days after it receives a charge to issue a right-to-sue letter.

But this does not end the Court's analysis.  The Court must also consider whether Section 2000e-5(b) invalidates the EEOC's regulation permitting "early" right-to-sue letters, as the D.C. Circuit concluded in *Martini*.  "Courts have a duty to construe statutes, not isolated provisions." *Graham Cty. Soil & Water Conservation Dist. V. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quotation marks omitted).

The Court respectfully disagrees with the conclusion of the D.C. Circuit in *Martini* because Section 2000e-5(b) does not speak directly to the question at issue.  The first step under Chevron is determining "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  Here, that question is whether the statute prohibits the EEOC from issuing early right-to-sue letters before the expiration of the 180-day period following the filing of a charge.  The Court does not believe that it does.  Section 2000e-5(b) requires that the EEOC investigate a claimant's charge "as promptly as possible," and not later than 120 days after the filing of that charge.  It does not mandate that the EEOC investigate for 180 days.  And it does not expressly bar the issuance of a right-to-sue letter before 180 days after the filing of a charge.

As the court held in *Martini*, the EEOC's duty to investigate claims is mandatory.  The Court shares the concern that the practice of issuing "early" right-to-sue letters may permit the agency to flout that mandatory duty.  Overturning the regulation may make that outcome less likely, as the *Martini* court reasoned.[4]  However, the text of the statute does not expressly mandate a 180-day waiting period before the issuance of a right-to-sue letter.[5]

---

[4] Or it might not:  the agency might commit the same amount of resources to investigate charges.
[5] The legislative history does not provide further clarity.  *See Figueira*, 944 F. Supp. at 306 (noting the ambiguity in the legislative history).

Because the statutory text does not demonstrate Congress's unambiguous intent to prohibit the EEOC from issuing a right-to-sue letter before the expiration of the 180-day period following its receipt of a charge, the Court must determine whether the EEOC's interpretation of the statute on which it relied in issuing its regulation permitting the issuance of "early" right-to-sue is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Courts "will not disturb an agency rule at Chevron Step Two unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Catskill Mountains*, 846 F.3d at 520 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011)). Therefore, "at [Chevron's] second step the court must defer to the agency's interpretation if it is 'reasonable.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Chevron*, 467 U.S. at 844).

The EEOC's interpretation of its statute is reasonable. The Court agrees with the other district courts in this circuit that have found that the EEOC's regulation "in authorizing the issuance of early right-to-sue notices, does not conflict with [the language of] Section 2000e-5(f)(1)," *Nodelman v. Gruner & Jahr USA Pub.*, No. 98 CIV. 1231 (LMM), 2000 WL 502858, at *6 (S.D.N.Y. Apr. 26, 2000), or its purpose "to ensure that parties are not required to wait indefinitely for administrative action," *Huang v. Gruner + Jahr USA Pub.*, No. 99 CIV. 5058 (DLC), 2000 WL 640660, at *2 (S.D.N.Y. May 17, 2000). The EEOC's duty to investigate is mandatory. But on its face, the EEOC's regulation does not undermine that duty. A designated official at the EEOC must still make a determination "that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge . . . ." 29 C.F.R. § 1601.28(a)(2). The right-to-sue letter issued to Mr. Germain contained just such a determination.

Moreover, the fact that a right-to-sue letter has been issued by the EEOC before the expiration of the 180-day period following a charge does not necessarily mean that the agency has

not conducted an investigation.  In some cases—if not here—the agency may have concluded the investigation *within* the 180-day period.  As Judge Pauley thoughtfully observed regarding the language used by the EEOC in an "early" right-to-sue letter, "this can also be interpreted as an indication that the EEOC conducted some form of an investigation but acknowledged the futility of retaining the charge at the EEOC for 180 days."  *Hernandez*, 2020 WL 3962108 (S.D.N.Y. July 13, 2020).  A declaration by the Court that the statute prohibits the issuance of "early" right to sue letters would add unnecessary delay in those circumstances where the agency investigation takes less than six months.

Because the EEOC's regulation is "based on a permissible construction of the statute," the right-to-sue letter issued by the agency is valid and Mr. Germain properly exhausted his administrative remedies.

### b.  ADA Claim Is Adequately Pleaded

Mr. Germain's ADA claim is adequately pleaded.  Defendant asserts principally that Mr. Germain has failed to adequately plead that he was "disabled" within the meaning of the ADA.  But his allegations regarding his serious illnesses and the limitations that they imposed on him during the COVID-19 pandemic suffice to meet his pleading burden.

The ADA establishes that no covered entity "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)."  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)).  To establish a *prima facie* case of

discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that:  "(1)

his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was

otherwise qualified to perform the essential functions of his job, with or without reasonable

accommodation; and (4) he suffered adverse employment action because of [her] disability."

*McMillan v. City of New York*, 711 F.3d at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161,

169 (2d Cir. 2006)) (quotation marks omitted).

      But of course, while many decisions regarding motions to dismiss (like this one) start with a

description of *McDonnell Douglas*'s *prima facie* case, the "burden-shifting" framework established in

*McDonnell Douglas* applies at summary judgment—not in the context of a motion to dismiss.  In the

context of a motion to dismiss, the Court does not analyze the evidentiary support for a claim.  "[A]

plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas* . . . to defeat a motion to

dismiss," *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015); *see also Gonzalez v.

Carestream Health, Inc.*, 520 F. App'x 8, 9-10 (2d Cir. 2013) ("To survive a motion to dismiss, a

complaint alleging workplace discrimination . . . need not allege specific facts establishing a prima

facie case of discrimination under McDonnell Douglas . . . .") (summary order).  Instead, "[this

Court] consider[s] only whether the complaint includes factual allegations sufficient 'to raise a right

to relief above the speculative level.'"  *Gonzalez*, 520 F. Appx at 10 (quoting *Twombly*, 550 U.S. at 555,

127 S. Ct. 1955)).

      A person is disabled within the meaning of the ADA if he has "a physical or mental

impairment that substantially limits one or more [of his] major life activities," or if he is "regarded as

having such an impairment."  42 U.S.C. § 12102(1).  Major life activities include, but are not limited

to, "caring for oneself, performing manual tasks, seeing, hearing . . . and working."  42 U.S.C.

§ 12102(2)(A).  "Th[is] definition of disability [is to be] construed in favor of broad coverage . . ."

*Id.* § 12102(4)(A).  "[A]n impairment need not prevent, or significantly or severely restrict, the

individual from performing a major life activity in order to be considered substantially limiting."
*Parada v. Banco Indus. de Venezuela, C.A.*, 753 F.3d 62, 68 n. 3 (2d Cir. 2014) (alterations and internal
quotation marks omitted) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). The "substantial-limitation
requirement in the definition of 'disability' is not an exacting one." *Woolf v. Strada*, 949 F.3d 89, 94
(2d Cir. 2020) (citation omitted).

While the coverage of the statute is broad, the Second Circuit has recognized a "well-
established understanding that an employee's inability to perform a single, particular job does not
constitute a substantial limitation in the major life activity of working." *Woolf*, 940 F.3d at 94
(internal quotations and citation omitted). "This longstanding, common-sense principle of law
recognizes that employees who are precluded only from doing their specific job, or from working
under a specific supervisor, do not have a 'disability.'" *Id.* "Rather, an employee alleging a
substantial limitation in the major life activity of working must show that the limitation affects the
ability to 'perform a class . . . or broad range of jobs.'" *Id.* (internal citations omitted).

Mr. Germain's complaint adequately pleads that he had a disability. His illnesses included
COPB, heart disease, cardiomyopathy, diabetes, and asthma. Am. Compl. ¶ 14. While serious in
their own right, the complaint alleges that the conditions substantially limited his ability to work
during the COVID-19 pandemic. His conditions made him "particularly vulnerable to the Covid-19
virus." *Id.* And his cardiologist advised him not to travel from home for work as a result of his
medical condition. Drawing all inference in favor of Mr. Germain, that Mr. Germain suffered from
illnesses that prevented him from safely leaving his home to work is sufficient to plead plausibly that
he was disabled.

Defendants do not seriously challenge the sufficiency of the complaint with respect to the
other aspects of Mr. Germain's claims under the ADA: he requested an accommodation not to
travel for his work. Nielsen did not respond to the request. Instead, representatives of the company

criticized his work and fired him shortly after the request for an accommodation.  One argument presented by Nielsen is fundamentally wrong:  they argue that Mr. Germain cannot make out a claim for their failure to accommodate him because "Plaintiff's request for an accommodation not to travel was for his own personal benefit and not for the benefit of NielsenIQ."  D. Mem. at 20.  Defendant articulates a novel interpretation of the ADA:  that "the ADA does not require employers to make accommodations to employees that are primarily for their own personal benefit."  *Id.*  This argument rests on a misreading of the law.  Almost by definition, a request for an accommodation to protect an employee's health is primarily for the benefit of the employee—to protect that employee's health and wellbeing.  The Court declines to adopt Nielsen's flawed perspective that an employer need not provide an accommodation unless it benefits the employer, and not the employee.

### C.  As Pleaded, the NYCHRL and NYSHRL Do Not Apply to Mr. Germain

Mr. Germain does not adequately plead a cause of action under the NYSHRL or the NYCHRL because the complaint does not plead that Mr. Germain experienced the impact of the alleged discrimination in New York.  This Court has held that for a plaintiff to bring a claim under the NYSHRL or the NYCHRL, they must experience the impact of the discriminatory conduct in the State or City, respectively.  *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) ("*Syeed I*").  That question has been certified to the New York Court of Appeals.  *See Syeed v. Bloomberg L.P.*, 58 F.4th 64 (2d Cir. 2023).  Pending the Court of Appeals' response, the Court applies the impact test as described in *Syeed I.*

As pleaded, Mr. Germain's allegations show, at best, only a tangential connection to New York.  Mr. Germain was a resident of Danbury, Connecticut.  Am. Compl. ¶ 1.  Defendant is a Delaware company headquartered in Illinois with an office in New York.  *Id.* ¶¶ 2, 32.  Mr. Germain alleged that he accepted the position with the understanding that "he would not be required to

travel." *Id.* ¶ 19.  And the complaint describes travel to New York as unanticipated travel.  As pleaded, the only connections between Mr. Germain and New York were two days of presentations that he did in New York.  Because Mr. Germain did not allege that he either worked or lived in New York, Defendant's motion to dismiss Mr. Germain's claims brought under the NYSHRL and the NYCHRL is granted.[6]

## IV.        LEAVE TO AMEND

The Court grants Plaintiffs leave to replead the dismissed claims.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party[,]" the Court does not conclude that it would be futile for Plaintiff to replead the dismissed claims.  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  As described in the note above, there may be facts that Plaintiff could plead that would alter the Court's analysis of his NYSHRL and NYCHRL claims.  Any amended complaint must be filed within fourteen days after the entry of this opinion.

## V.        CONCLUSION

For the reasons stated above, Defendant's motion to dismiss Mr. Germain's third amended complaint is granted in part and denied in part.  Defendant's motion to dismiss is denied with

---

[6] In his opposition, Mr. Germain's counsel argues that "Germain was hired with the understanding that he would be expected to work in-person from Nielsen's New York City office when the COVID-19 pandemic ended."  Plaintiff's Memorandum of Law, Dkt. No. 57, at 12.  Counsel also writes:  "Despite the fact that he was temporarily working from his home in Connecticut, Nielsen considered Germain to be a New York City employee."  *Id.*  But these facts are not alleged in the complaint.  One cannot amend a pleading through an opposition.  *See United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020) ("It 'is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.") (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)).  Well-pleaded allegations that Mr. Germain was a New York employee temporarily working from home might substantially impact the Court's analysis of this question.

respect to Mr. Germain's ADA and fraudulent misrepresentation claims.  Defendant's motion to

dismiss is granted without prejudice with respect to Mr. Germain's NYCHRL and NYSHRL claims.

Any amended complaint must be filed within fourteen days after the entry of this opinion.

      The Clerk of Court is directed to terminate the motion pending at Dkt. No. 54.

      SO ORDERED.

Dated:  February 8, 2023
New York, New York

                                   GREGORY N. WOODS
                               United States District Judge